**Donald D. DOUGLAS, Petitioner,**

v.

**The PEOPLE of the State of
Colorado, Respondent.**

**No. 97SC694.**

Supreme Court of Colorado,
En Banc.

Nov. 30, 1998.

Rehearing Denied Jan. 11, 1999.

David F. Vela, Colorado State Public Defender, Joan E. Mounteer, Deputy State Public Defender Denver, Colorado, Attorneys for Petitioner.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, John Daniel Dailey, Deputy Attorney General, Robert Mark Russel, First Assistant Attorney General, Lauren A. Edelstein, Assistant Attorney General, Criminal Enforcement Section, Denver, Colorado, Attorneys for Respondent.

Justice SCOTT delivered the Opinion of the Court.

In this case, we must decide whether the trial court erred when it admitted evidence of two prior incidents in which the defendant used a gun, when not threatened by the use of force by another, in order to rebut defendant's claims of self-defense and defense of premises.[1] We hold that it did not.

Evidence of other acts, while not admissible to prove the character of a person in order to establish conduct in conformity therewith, may be admitted for other purposes. *See* CRE 404(b). Here, after a pretrial hearing, the trial court ruled that evidence of extrinsic acts may be used to rebut self-defense and defense of premises claims, a purpose that is independent of the potential likelihood of showing defendant's bad character, prohibited by CRE 404(b). In *People v. Douglas*, No. 95CA1458 (Colo.App. July 3, 1997) (not selected for official publication), a divided court of appeals held that the trial court did not err when it admitted evidence of prior acts in which the defendant brand-

---

1. Our order granting certiorari set forth the following issue for briefing and argument:
    Whether the petitioner's constitutional rights to due process and a fair trial were denied when the trial judge admitted evidence of prior bad acts.

ished a gun when not threatened by others as evidence of mens rea when using a gun in a subsequent incident. We agree and therefore affirm the judgment of the court of appeals.

## I.

### A.

On October 19, 1994, the petitioner, Donald D. Douglas ("Douglas" or "defendant") pointed a loaded gun at William Fritz and his thirteen-year-old son, Anthony Fritz. Douglas claimed he acted in self-defense. The People, respondents before us, used evidence of extrinsic and prior acts to rebut Douglas' self-defense and defense of premises claims [2] and to prove Douglas' intent.

This encounter began when William Fritz drove his son, Anthony, to South Pennsylvania Street in Denver to visit Douglas, a family friend. When they arrived at the block where Douglas' home is located, William parked across the street and a couple of houses down from Douglas' house. William told his son to go up to Douglas' house and ask Douglas if they, Douglas and William, could "work something out" regarding a $400 loan William Fritz had made to Douglas.

As Anthony approached the house, he saw Douglas standing on the front porch with his hands in his coat pockets. Anthony asked Douglas if William Fritz could come over to discuss the loan. Douglas replied that there was nothing to say.

As Douglas spoke, he brought a gun out of his coat pocket, pointed the gun at Anthony, and told him that if he did not leave, he would not live to see his next birthday. Out of fear, Anthony slowly backed away from Douglas. In response, William Fritz, who had been watching the incident from his

parked car, quickly drove up and parked in front of Douglas' house. William immediately got out of his car and placed himself between Douglas and his son.

Frightened and crying, Anthony ran across the street to a neighbor's house to call the police. When Anthony returned, he saw Douglas pointing the gun at his father's head. After directing verbal threats at William, Douglas pulled the trigger several times and attempted to fire the gun at William. However, despite his efforts, the gun did not discharge or fire any bullets. Both Anthony and William Fritz testified that they could see bullets in the chamber of the revolver and knew that the gun Douglas was attempting to fire at William was loaded.

The Fritzes were eventually able to back away from Douglas, reenter their vehicle, and drive to a public telephone where they called the police. When the police arrived, they arrested Douglas and took him into custody.

On October 24, 1994, Douglas was charged with two counts of felony menacing [3] in the Denver District Court (trial court). On February 17, 1995, the prosecution filed a motion for an extension of time to investigate evidence of prior similar acts by Douglas, which it intended to introduce at trial. The motion was granted, and on March 1, 1995, the prosecution filed a notice of intent to present evidence of three prior incidents in which Douglas allegedly brandished a gun and threatened others. The prosecution sought to introduce the prior acts evidence "to show . . . intent . . . and to rebut any claim of self-defense."

On April 13, 1995, Douglas disclosed that he would assert the statutory defenses of self-defense: (1) use of physical force in defense of premises; [4] and (2) use of physical force in defense of a person. [5]

---

**2.** For purposes of brevity, we will refer to self-defense when speaking of both defense of person and defense of premises.

**3.** Section 18–3–206, 6 C.R.S. (1998), provides as follows:

Menacing. A person commits the crime of menacing if, by any threat or physical action, he knowingly places or attempts to place another person in fear of imminent serious bodily injury. Menacing is a class 3 misdemeanor, but, if

committed by the use of a deadly weapon, it is a class 5 felony.

**4.** Section 18–1–705, 6 C.R.S. (1998), provides:

A person in possession or control of any building, realty, or other premises . . . is justified in using reasonable and appropriate physical force upon another person when and to the extent that it is reasonably necessary to prevent or terminate what he reasonably believes to be the commission or attempted commission

Douglas also filed an objection to the prosecution's proffer of evidence of prior bad acts pursuant to CRE 404(b). The trial court set a hearing on the prosecution's motion for May 3, 1995.

## B.

At the May hearing, the trial court heard testimony regarding three prior incidents: (1) a February 1980 incident with Harold Ingram; (2) a July 1993 incident with Karen Dhooge, Douglas' girlfriend; and (3) a July 1994 incident with Donna Shore, Douglas' neighbor.

Harold Ingram testified about the 1980 incident in which, during a traffic altercation, Douglas purportedly pointed a gun at Ingram when Ingram approached Douglas after both vehicles came to a stop. Ingram, however, could not identify Douglas as the man who threatened him with a gun.

Karen Dhooge, Douglas' former girlfriend, testified regarding an incident between her and Douglas that occurred in July 1993. Dhooge and Douglas drove by truck to South Dakota to go camping. One night, without provocation from Dhooge, Douglas became enraged. Dhooge testified that Douglas repeatedly threw her against a wall and became verbally abusive. Douglas then exited the cabin and retrieved a gun from the truck. Upon returning to the cabin, Douglas instructed Dhooge to sit beside him on the bed, pointed the gun at Dhooge's head, and asked her if she was afraid to die. Douglas then instructed Dhooge to leave the cabin, which she did. Douglas, however, followed her, again pointed the gun at her through the truck's window as she was attempting to drive away, and instructed her to return to the cabin.

The third prior incident occurred in July 1994, months before the encounter between the defendant and the Fritzes. It involved

Donna Shore, a neighbor, and her thirteen-year-old daughter, Solitaire. The Shores lived two houses away from Douglas' house. Donna Shore testified that on the morning of July 28, 1994, she and her daughter heard Douglas pounding on the windows of their home, screaming, "Come out here now." Because Douglas had previously threatened to kill her dogs, Solitaire immediately ran into the backyard to check on them. Donna followed Solitaire, and observed that Douglas had broken through the fence and was standing in their backyard. He was carrying a gun, which he pointed at Donna's "chest area" while shouting, "I'm going to kill all of you." Donna and Solitaire ran back into their house, closing the door behind them. Douglas broke through that door and pursued Donna with the gun in his hand. Donna ran into the kitchen, and jammed the kitchen door shut. Douglas continued pounding on that door while yelling he "was going to kill all of [them]." A neighbor called the police. While the police first gave Douglas a warning and told him to go back to his home, the police returned later that day and arrested Douglas based on his continued harassment of Donna and Solitaire.

No other evidence was presented at the hearing. However, Douglas did argue that the prosecution only intended to use the evidence to show that he had "bad character" and that he "has a propensity to threaten other people with guns." Douglas also argued that "[t]here is no logical relevance for th[e] evidence independent of an inference of bad character. . . ." The prosecution asserted that: (1) the evidence was admissible under *People v. Spoto*, 795 P.2d 1314 (Colo. 1990); (2) the evidence was only offered to "rebut a claim of self-defense"; and (3) if the defendant abandoned his self-defense and defense of property claims that intent would no longer serve as a "a proper purpose" for the admission of the prior acts.

of an unlawful trespass by the other person in or upon the building, realty, or premises. . . .

5. Section 18-1-704(1), 6 C.R.S. (1998) provides: [A] person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose.

The trial court applied the *Spoto* test, and ruled that "the similarities in this case with the 1980 transaction are not sufficient" and that "no identification of this Defendant was made" by Ingram. Therefore, the trial court prohibited the prosecution from introducing evidence of the extrinsic incident involving Ingram. The propriety of this ruling is not before us.

However, the trial court ruled that the prosecution could present evidence of the two other prior acts. The trial court reasoned that the prosecution could present evidence of the 1993 and 1994 incidents because those prior acts were similar in that they "indicate the Defendant, one, having a gun; two, pointing at someone; three, threatening them." In addition, the trial court ruled that the logical relevance of those two acts of 1993 and 1994 was independent of the inference prohibited by CRE 404 in that the prior acts demonstrated that "absent any threat, this person would pull a weapon." The trial court also reasoned that in light of the defenses disclosed by Douglas, the prior acts evidence was "independent of bad character" and that its probative value was not outweighed by the danger of unfair prejudice. The trial court noted that "when [Douglas] was not in a self-defense situation . . . he did exactly the same thing, . . . calling exactly into question the defense urged here."

### C.

Douglas' trial before a jury was held from May 30, through June 1, 1995. During the trial, Douglas asserted his self-defense claims and the prosecution introduced evidence of prior acts. The jury was instructed as to Douglas' claims of self-defense. The trial court also included a limiting instruction in its charge to the jury.

On June 1, 1995, the jury found Douglas guilty of both charges of menacing. The trial court sentenced him to two concurrent two-year sentences. Douglas appealed to the court of appeals.

On appeal, a divided court of appeals affirmed, holding that "because [the evidence] bore on the issues of [Douglas'] defenses and the elements of menacing, the [prior acts]

evidence satisfies all four prongs of the *Spoto* analysis." *People v. Douglas,* No. 95CA1458 slip op. at 3 (Colo.App. July 3, 1997) (not selected for publication). We granted certiorari and now affirm the judgment of the court of appeals.

### II.

#### A.

Appellate review is necessarily guided and limited by our precedent interpreting the Colorado Rules of Evidence. *See People v. Willner,* 879 P.2d 19, 25–27 (Colo.1994); *Spoto,* 795 P.2d at 1318.

Unless otherwise provided by the Colorado or federal constitutions, the Colorado Rules of Evidence, or Colorado statutes, "[a]ll relevant evidence is admissible." CRE 402; *Spoto,* 795 P.2d at 1318. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." CRE 401.

Relevant evidence may not be admissible, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." CRE 403. Moreover, our Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In essence, "evidence of other . . . acts is inadmissible if the logical relevance of the proffered evidence depends upon an inference that a person who has engaged in such misconduct has a bad character and the further inference that the defendant therefore engaged in the wrongful conduct at issue." *Spoto,* 795 P.2d at 1318 (citing E. Imwinkelreid, *Uncharged Misconduct Evidence* § 2.18 (1984)); *see also Willner,* 879 P.2d at 26.

A trial court is vested with substantial discretion when determining whether to admit evidence of other acts, and its ruling will be disturbed only when it is demonstrat-

ed that the trial court abused that discretion. *See People v. Ibarra,* 849 P.2d 33, 38 (Colo. 1993).

### B.

In *Spoto,* we first announced the standard applicable in this case and held that evidence of a single prior bad act that was not sufficiently similar to the incident in question should not have been admitted. *See Spoto,* 795 P.2d at 1318; *see also Willner,* 879 P.2d at 26 (holding that, pursuant to *Spoto,* evidence of two prior similar incidents was admissible to show intent). Vincent Spoto was charged with first-degree murder in connection with the death of Roger Berg. *See* 795 P.2d at 1315. Spoto and David Bowman had gone out to a nightclub where Melinda Deeringer, a dancer, invited Bowman to her apartment to spend the night. *See id.* However, when Bowman met Deeringer at her apartment, she arrived with another man, Roger Berg. *See id.* at 1316. Deeringer told Bowman she was spending the evening with Berg and that he had to leave. *See id.* Upset, Bowman left and informed Spoto of what had happened. *See id.* Bowman and Spoto returned to Deeringer's apartment; Spoto was armed with a gun. *See id.* Although witnesses differed as to what happened after Spoto entered Deeringer's apartment, it was undisputed that Berg's death was caused by a bullet fired from Spoto's gun when the barrel of the gun was touching Berg's neck. *See id.* Spoto claimed self-defense and accident. *See id.*

At Spoto's trial, the trial court allowed the prosecution to counter Spoto's claim of self-defense by introducing evidence of a prior incident that occurred a few weeks earlier in which Spoto had suspected a theft of his personal property upon returning home late one night. *See id.* at 1316–17. At the time, two individuals, Brett DeWeese and Heidi Smith, lived at the house with Spoto and Bowman. *See id.* at 1317. Upon discovering certain items missing, Spoto entered the bedroom where DeWeese and Smith were sleeping, and asked them if they had stolen the missing items. *See id.* DeWeese and Smith denied committing the theft, at which time Spoto pointed an unloaded gun at DeWeese

and asked, "swear to God?" *Id.* The incident ended, however, when they heard noises made by a burglar escaping from the house. *See id.*

The court of appeals reversed the conviction, and we affirmed. In so doing, we announced a four-part test for courts to use when determining whether evidence of a prior incident should be admitted:

> First, we must ask whether the proffered evidence relates to a material fact, i.e., a fact "that is of consequence to the determination of the action." If it does, we proceed to the second question: is the evidence logically relevant, i.e., does it have "any tendency to make the existence of [the material fact] more probable or less probable than it would be without the evidence?" If the evidence is logically relevant, we then must determine whether the logical relevance is independent of the intermediate inference, prohibited by CRE 404(b), that the defendant has a bad character, which would then be employed to suggest the probability that the defendant committed the crime charged because of the likelihood that he acted in conformity with his bad character. Finally, if the proffered evidence survives the first three parts of the analysis, we must assess whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

*Spoto,* 795 P.2d at 1318 (citations omitted).

In analyzing the facts of *Spoto* under that test, we held that the prior incident in which Spoto pointed a gun at DeWeese satisfied the first and second prongs of the newly announced test. However, we concluded that it failed to meet the third prong, because the prior incident was not similar enough, and because there was only one prior instance of Spoto using a gun. *See id.* at 1318–19. Nevertheless, we also concluded that even if the evidence of the prior incident had been logically independent of the intermediate and prohibited inference, it would have failed the fourth prong of the test, in that the potential for prejudice by admission of the prior incident was overwhelming. *See id.* at 1320.

However, applying our test announced in *Spoto* to the circumstances of this case, today we reach a different result.

### III.

■ Based on the defenses asserted by Douglas, defense of person and premises, we conclude that all four prongs of the *Spoto* test were satisfied here. Douglas concedes the first prong, that the testimony related to a material fact, namely Douglas' intent under his claims of self defense. Douglas similarly concedes the second prong, that the contested testimony is logically relevant to the material issue of intent. *See Spoto*, 795 P.2d at 1319 ("At minimum, the incident suggests that [defendant] is the type of person who would pull a gun on someone when it is not necessary for self-defense.").

As to the third prong of *Spoto*, Douglas contends that the evidence demonstrates only his propensity for threatening people with a gun, and that, therefore, the logical relevance is not independent of the immediate inference that Douglas has bad character. We are not persuaded and we find our holding in *People v. Willner*, 879 P.2d 19 (Colo. 1994), helpful.

In *Willner*, the defendant was charged with first degree murder as a result of the shooting death of a man attempting to repossess his car. *See id.* at 20–21. The defendant, Willner, claimed self defense. *See id.* at 21. At trial, the court admitted evidence of two prior incidents, one in which Willner fired several shots to prevent an earlier repossession, and one in which he fired several shots at someone stealing a Christmas tree, to demonstrate Willner's deliberation, intent and state of mind. *See id.* at 25–26. In reversing the court of appeals and holding that the evidence was properly admitted, we stated that the similar incidents were "logically relevant, in that they make it more probable that Willner acted with criminal intent in shooting the victim," and that this logical relevance was "independent of the inference that [the incidents] demonstrate that [Willner] has a bad character." *See id.* at 27.

Applying our reasoning in *Willner*, we similarly hold that the logical relevance of the testimony concerning the Dhooge and Shore incidents is independent of the prohibited inference that Douglas has a bad character. In so doing, we conclude the evidence was probative of the disputed issue of Douglas' mens rea regarding his self-defense claims. We therefore hold that the evidence was admissible to rebut Douglas' self-defense claims because that evidence had independent relevance by demonstrating that Douglas previously threatened others by use of a gun without provocation and in the absence of any danger to himself. Had Douglas not asserted his claims of self-defense, there may not have been any logical relevance independent of showing his bad character as prohibited by CRE 404(b).[6]

The matter at issue in this case, however, is not the mens rea to commit the crime of menacing, which by his claim of self-defense Douglas, in effect, admits. *See People v. Dover*, 790 P.2d 834, 835 (Colo.1990) ("An affirmative defense is essentially an admission of the crime charged, but seeks to justify, excuse or mitigate the defendant's conduct.").[7] Instead, the question the jury had

---

6. We note also that while the trial court admitted evidence of two prior incidents, the prosecution tendered three incidents. The extant case is distinguishable from *Spoto*, which involved only one prior similar act. Thus, this much higher frequency of similar conduct requires greater deference be given the trial judge's ruling. In *Spoto*, as to the third prong, we relied, at least in part, on the doctrine of chances in concluding that the evidence there was not independent of the prohibited intermediate inference of bad character. *Spoto*, 795 P.2d at 1318. Under the doctrine of chances:

> The more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence of repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently.... However, in the context of other misdeeds, the defendant's act takes on an entirely different light. The fortuitous coincidence becomes too abnormal ... or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea.

E. Imwinkelreid, *Uncharged Misconduct Evidence* § 5.05 (1996) (footnotes omitted).

7. As instructed by the trial court, the jury was to determine whether Douglas "by threat or physical action, knowingly placed or attempted to

to decide was whether Douglas had the requisite intent of self-defense to justify or excuse his actions, permitting him to escape criminal liability through his affirmative claim of self-defense. That is, did Douglas use the gun in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful physical force by his victims, and whether Douglas used force reasonably necessary for that purpose, or did he act only to menace his victims?[8] It is this state of mind, sufficient to avoid criminal responsibility unless the prosecution disproves its existence beyond a reasonable doubt, that was before the jury and to which

the prior acts provided relevant evidence independent of the prohibited inference of bad character, as the trial court so noted.[9]

■ Finally, addressing the fourth prong in our *Spoto* analysis, we conclude "that the probative value of this evidence, in assisting the jury to analyze [Douglas'] state of mind, outweighed the danger of unfair prejudice." *Willner*, 879 P.2d at 27. Hence, we agree with the trial court's rational and permissible conclusion that the unfair prejudice is substantially outweighed by the probative value of the evidence that might otherwise be excluded.[10]

place another person in fear of imminent serious bodily injury."

8. The trial court instructed the jury in that regard as follows:

INSTRUCTION NO. 10
The evidence presented in this case has raised an affirmative defense.
The prosecution has the burden of proving the guilt of the defendant to your satisfaction beyond a reasonable doubt as to the affirmative defense, as well as to all the elements of the crime charged.
After considering the evidence concerning the affirmative defense, with all the other evidence in this case, if you are not convinced beyond a reasonable doubt of the defendant's guilt, you must return a verdict of not guilty.
INSTRUCTION NO. 11
It is an affirmative defense to the crime of menacing that the defendant used physical force upon another person
1. in order to defend himself or a third person from what he reasonably believed to be the use or imminent use of unlawful physical force by the victim, and
2. he used a degree of force which he reasonably believed to be necessary for that purpose.
INSTRUCTION NO. 12
It is an affirmative defense to the crime of menacing that the defendant:
(1) Was in possession or control of any building, real estate, or other premises, or was licensed or privileged to be thereon, and
(2) Used reasonable and appropriate physical force upon another person,
(3) To the extent it was reasonably necessary to prevent or terminate what he reasonably believed to be the commission or attempted commission of an unlawful trespass by the other person in or upon the building, real estate, or premises.

9. The trial court, Hon. Jeffrey Bayless presiding, ruled:
This is Mr. [Douglas'] argument. . . . [T]he evidence is attempting to show that the Defendant acted in conformity with bad character, that he

has a propensity to threaten other people with guns.
That's not the test. I will read it again. "If the evidence is logically relevant, we then must determine whether the logical relevance is independent of the intermediate inference, prohibited by C.R.E. 404(b), that the Defendant has a bad character, which would then be employed to suggest the probability that the Defendant committed the crime charged because of the likelihood that he acted in conformity with his bad character."
The evidence being offered and all similar transaction 404(b) evidence has that potential likelihood, that this is a bad person, and therefore, bad persons do bad things, and therefore, you ought to convict him. That's why the limiting instruction started with *Stull [v. People*, 140 Colo. 278, 344 P.2d 455 (1959)] and continues to this day.
The Court finds that there is in this case logical relevance when he, in other circumstances when he was not threatened, would use a weapon, would point a weapon, leaded [sic] or unloaded, I don't know, at other persons. . . .
The Court concludes that the pattern, especially as recently as three months before this, and it goes back to a year and three months before this, shows that absent any threat, this person would pull a weapon. That, the Court finds, shows that the defense of another and that's the only reason I did this, makes it independent of the bad character, and I find that's been satisfied.

10. Judge Bayless further ruled:
Finally, the fourth part is if the proffered evidence survives the first three parts of the analysis, we must assess whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. So the wording once again is funny. We must assess whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

On its face, the first clause of CRE 404(b) appears to disallow all evidence of prior similar incidents because such evidence might be used to prove the defendant acted in a similar fashion based on character in the charged offense. Were this the true extent of the rule, it would seem that Douglas' argument should prevail and that the trial court did, indeed, err. Rule 404(b), however, is not only a rule of exclusion, but also permits the admission of "other crimes, wrongs, or acts ... for other purposes." In effect, it establishes a standard which requires a reasoned weighing of countervailing interests before admitting or excluding evidence. *See* J.W. Strong, McCormick on Evidence § 190 (4th ed.1992). Thus, while the rule is designed to protect parties, especially criminal defendants, from the human tendency to permit notions of bad character to carry the day, at the same time, it recognizes that the difficult task of fact-finding is better facilitated when, if not unduly prejudicial, relevant evidence is admitted. *Id.* This is certainly true where sufficient protections exist, such as jury instructions to limit the use of the evidence.

> The danger of unfair prejudice is Mr. [Douglas'] argument that ... the prosecution, will say to the jury, see, this is what he has done in the past; therefore, he did it again, without ever having been convicted of the criminal offenses in those cases. The District Attorney may not make such argument. The argument which will be allowed, however, is that these are incidents when he was not in a self-defense situation when he did exactly the same thing,

In light of the foregoing, we agree that under the facts present here, the trial court properly concluded that the evidence was probative of facts independent of the inference of bad character.

## IV.

In sum, we hold that evidence of prior incidents in which Douglas brandished a gun at individuals without provocation or danger to himself are admissible under CRE 404(b) to rebut his claims of self-defense and defense of premises. We further hold that the admission of such evidence did not subject the defendant to undue prejudice, nor did it deny Douglas a fair trial. Accordingly, we affirm the judgment of the court of appeals.

and that calls exactly into question the defense urged here.

. . . .

> Is it logically relevant? Yes, of course, especially in light of the defenses. Is the relevance independent of the intermediate inference, the intermediate inference being he's a bully? The answer is yes, because it is the fact that this is how he acts.